UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| **Tammy Lanius,**<br><br>          **Plaintiff,**<br><br>v.<br><br>**Capital One Services, LLC,**<br>**Capital One Financial Corporation, and**<br>**Capital One, National Association,**<br><br>          **Defendants.** | **CIVIL ACTION NO.** _____ |

## **COMPLAINT**

Plaintiff Tammy Lanius, ("Plaintiff" or "Lanius"), respectfully moves for judgment against Defendants Capital One Services, LLC, Capital One Financial Corporation and Capital One, National Association, (collectively "Capital One" or "Defendants"):

### **Introduction**

1. This is a claim for relief pursuant to Older Workers Benefits Protection Act (OWBPA), and subject to this Court's ruling on the OWBPA claim, should Plaintiff prevail on such claim, then Plaintiff asserts a corresponding claim under the Age Discrimination in Employment Act (ADEA). Plaintiff was employed by Capital One, and upon her termination signed a "Letter of Agreement" purporting to release her claims under ADEA. Plaintiff alleges that she was terminated pursuant to an employment termination program and that the Letter of Agreement failed to comply with the OWBPA requirement of 45-day consideration period and a listing of names and job titles of others affected by the program. Plaintiff is entitled to keep her

1

severance payment and sue Capital One for age discrimination. *Oubre v. Entergy Operations*, 522 U.S. 422 (1998). Plaintiff may sue for an OWBPA violation. *Krane v. Capital One*, 314 F. Supp. 2d 589 (E.D.Va. 2004) (Payne, J.). In conjunction with a Court determination that the Letter of Agreement did not comply with OWBPA and, conditioned on such finding, plaintiff seeks relief for age discrimination under ADEA.

2. Although Plaintiff intended to bring this as a collective action under 29 U.S.C. § 216(b), the Court's decision on June 8, 2020 in *Hutchens v. Capital One Services, LLC, et al.*, Case No. 19-cv-546 precludes such an action because the identical "Letter of Agreement" that Plaintiff signed was at issue in *Hutchens* for which this Court held that plaintiff could not proceed collectively. If this Court or a higher Court ultimately reverses the *Hutchens* holding and allows a collective action to proceed, then Plaintiff will join with the plaintiff in *Hutchens* and other similar cases in order to proceed collectively against Defendants, and Plaintiff reserves the right to amend this Complaint accordingly.

## Jurisdiction and Venue

3. This Court has jurisdiction for the ADEA claims pursuant to 29 U.S.C. § 216(b) as incorporated by 29 U.S.C. § 626(b), and under 29 U.S.C. § 626(c), in that the Plaintiff may bring this action in any appropriate United States District Court.

4. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

5. Defendants are subject to personal jurisdiction in the Commonwealth of Virginia.

## Parties

6. Lanius is a resident of Texas who was employed by Capital One most recently as

a "Scrum Master."  Plaintiff was an "employee" as defined in the ADEA.

7. Capital One Services, LLC is a Virginia limited liability company, which has its principal office in Virginia.

8. Capital One Financial Corporation is a foreign corporation, which has its principal office in Virginia.

9. Capital One, National Association is a foreign corporation, which has its principal office in Virginia.

10. On information and belief, the Defendants are related entities in the financial products and services industry. According to filings with the Virginia State Corporation Commission, the Defendants list their principal office as being located at 1680 Capital One Drive, McLean, Virginia 22102 and share the same registered agent.  Plaintiff is currently unable to determine the precise corporate structure and relationship between Defendants.  Defendants are an "employer" as defined by the ADEA.

## Factual Allegations

11. Lanius had previously worked for Capital One before she was re-hired by Capital One in 2011.

12. Lanius worked from Capital One's office in Plano, Texas but reported to Capital One managers in West Creek in Goochland County, Virginia.  On the days she did not work at the Plano office, Lanius worked remotely from home.

13. During the time frame relevant to this lawsuit, Lanius worked in the Technology Department as a Scrum Master for Capital One.

## Performance Management

14. Capital One has five categories for its performance evaluation ratings scale:

Exceptional, Very Strong, Strong, Inconsistent, Action Required.

15. Capital One informally refers to the five categories as five "buckets."

16. As part of the evaluation process each year, Capital One employees are issued an overall rating which places them within one of the five "buckets." This overall rating consists of two areas: "Results" (which are generally objective metrics) and "Competencies" (which consist of subjective criteria such as "communications," and "lives the values").

17. During Plaintiff's employment with Capital One, Lanius consistently received strong performance evaluations, including her Year End evaluation in 2016 (issued in early 2017), where she received an overall rating of "Strong."

### Policy to Increase "Involuntary Attrition"

18. Capital One claims to hire the best and brightest associates available. For example, Chief Information Officer (CIO) Rob Alexander stated in a blog post on July 19, 2017 that Capital One has a "best people philosophy," which involves hiring the "best talent in the industry."

19. During the relevant time period, Capital One implemented a policy that sought to increase Capital One's "involuntary attrition" rate of employees, that is, terminations based on alleged poor performance or job elimination.

20. In order to carry out Capital One's new policy to increase "involuntary attrition" it changed or implemented other personnel policies, including:

   a. Prohibiting employees rated "Inconsistent" from finding other roles within Capital One (the "No-Transfer" policy);

   b. Changing from a "performance management" distribution that was a "guide" or "aspirational" distribution (previously as low as 5% in the bottom two

"buckets"), to a <u>mandatory</u> forced distribution;

   c. Changing the prior policy which only required a "coaching plan" or PIP for employees in the "Action Required" bucket, to now also requiring a coaching plan or PIP for all employees who are rated in the "Inconsistent" bucket.

21. The No-Transfer policy that went into effect was that any employee rated "Inconsistent" was prohibited from transferring to another role within Capital One without special dispensation from a VP-level executive. Individual discretion of managers to accept transfers of employees rated "Inconsistent" was prohibited. Previously employees rated "Inconsistent" were allowed and encouraged to find other roles within Capital One (based on its "best people philosophy"), and the hiring managers had wide discretion to approve, and routinely did approve, such transfers.

22. The most significant change in Capital One policy was that it intentionally sought to increase its rate of "involuntary" terminations.

23. Capital One tracks percentages of "involuntary" terminations, also known within Capital One as "involuntary attrition."

24. At Capital One, "involuntary attrition" refers generally to terminations that are "involuntary" to the employee, namely (1) performance-based terminations, and (2) job eliminations (known within Capital One as "restructuring").

25. Upon information and belief, Capital One required its managers to involuntarily terminate a set percentage of its employees across all business units.

26. The policy requirement to meet specific "involuntary attrition" targets was set by the highest executives within Capital One.

27. "Performance Management" was the primary means by which this central policy

of increasing "involuntary attrition" rates was implemented.

28. At Capital One the term "distribution" means the range of performance ratings set for each "bucket" of performance. Previously the "distribution" percentages set for each "bucket" was aspirational. During the relevant time period of this lawsuit, Capital One's "distribution" percentages were mandatory.

29. This "Performance Management" policy of forcing managers to rank a fixed percentage of employees as poor performers was informally called "forced rankings" or "forced distribution" by Capital One employees.

30. Under the guise of "Performance Management," the Executive Committee (EC) members, (the highest echelon of executive leadership at Capital One), determined the specific forced "distribution" percentages applicable to their lines of business. Managers within those lines of business had to meet the forced distribution resulting in a fixed percentage of employees ending up in each of the performance "buckets" as pre-determined by the EC executive.

31. From the bottom two "buckets," employees were placed on "coaching plans" or "performance improvement plans" ("PIPs").

32. Employees who, through "Performance Management" were forced into the bottom two buckets or placed on "coaching plans" and "PIPs," were the pool from which managers then would identify the ultimate target of "involuntary" terminations.

33. In addition to "Performance Management," Capital One engaged in some "restructuring" in the form of job eliminations which also counted towards its targeted increase of its "involuntary attrition" rate.

34. Elsewhere in the private sector, where an employer requires a set percentage of employees to be ranked as poor performers, this practice is commonly called "stack rankings."

(*See, e.g.* Amazon to Drop Dreaded Stack-Ranking Performance Reviews, *Seattle Times*, Nov. 14, 2016; Microsoft Gets Rid of Stack-Ranking Review System, *Seattle Times*, Nov. 12, 2013).

35. The problem with stack rankings is that employees who are objectively meeting all performance expectations are falsely rated as poor performers.

36. Falsely giving good employees poor performance evaluations became Capital One's standard operating procedure under its "Performance Management" policy.

37. The Requirement that a fixed percentage of employees be rated as poor performers, with a subset therein being terminated "involuntarily," led to objectively well-performing employees being issued poor performance evaluations, coaching plans, and PIPs, and ultimately terminated.

38. Although performance evaluations, coaching plans, PIPs, and terminations were issued directly to individual employees, it was all done as part of an overall policy implemented by Capital One to increase "involuntary attrition" rates across all lines of business.

39. Through "involuntary attrition" of current employees, Capital One was making room for younger employees pursuant to a marketing, recruiting, and hiring campaign to attract recent college graduates.

40. At the same time that Capital One was implementing stack rankings to increase the rate of "involuntary" terminations, it was engaging in a marking, recruiting, and hiring campaign to attract recent college graduates to Capital One.

41. "Our No. 1 principle is to attract really talented people," [Capital One VP of Human Resources Judy] Pahren says. "We know our success is dependent on talent." Recruiting younger workers like millennials, she adds, "is key to that strategy." *See* Virginia Business

Magazine, The Rise of Millennials, November 2019.[1]

42. Capital One's effort to hire younger workers came through its Campus Recruiting Program ("CRP"), which focused on hiring only recent college graduates.

43. Within the past two years the CRP has been open only to college graduates in classes 2017 to 2021. Based on the general age of college graduates between the years of 2017 and 2021, Capital One has essentially set its hiring criteria to candidates in their early to mid-20s.

44. Currently, Capital One's website makes clear that its "Full-Time Programs" in the CRP are limited only to college graduates from the classes of 2019 to 2021. (https://campus.capitalone.com, visited December 22, 2020).  The website directs anyone who graduated before 2019 to apply for jobs to Capital One's main site, separate from the CRP programs:



(https://campus.capitalone.com/full-time-programs/, visited December 22, 2020) (red circle

---

[1] Available at https://www.virginiabusiness.com/article/the-rise-of-the-millennials/ (last accessed Dec. 4, 2020).

added, link redirecting to https://www.capitalonecareers.com/search-jobs).

45. In order to make room for the new CRP recruits in their early to mid-20's, Capital One intentionally increased its "involuntary attrition" rate, that is the rate at which employees are involuntarily terminated from their employment with Capital One.

46. In order to increase its "involuntary attrition" rate and to make room for new hires in their early to mid-20's through the CRP program, Capital One required its managers to engage in the forced distribution, stack rankings, and issuance of "coaching plans" and "PIPs," under the guise of "performance management" as set forth above.

### Technology Department Forced Distribution

47. As stated above, the Executive Committee (EC) member for each line of business was responsible for setting the forced distributions percentages for "performance management." CIO Alexander is the EC executive that determined the involuntary attrition rate for all Capital One Technology department employees.

48. On or about October 16, 2017, CIO Alexander sent an email to all Capital One employees in the Technology department, approximately 9,000 employees including Lanius, stating that Capital One was forcing managers to rank 12% of its employees as not meeting expectations in the next round of performance evaluations.

49. CIO Alexander stated in the email: "we will have a minimum of 12% of our associates in the Action Required and Inconsistent buckets combined."

50. CIO Alexander's email further required that those 12% of employees must be issued either "coaching plan" or "performance improvement plan" (PIP).

51. In order for the Technology department to meet its overall minimum 12% mandate, some internal units had a mandatory distribution higher than 12%. For example,

9

Nannette Hutchens' unit, Mosaic Tech, required its managers to rate 13% if its employees in the bottom two "buckets." Managers in another unit, "Shared Tech," were required to place the bottom 20% on either Coaching Plans or PIPs, according to a September 2017 email from EVP George Brady (who reported to CIO Alexander).

52. CIO Alexander's email reflected the Technology department's implementation of the aforementioned Capital One change from "performance management" distribution previously being a "guide" or "aspirational," to a mandatory forced distribution. Specifically, Technology's distribution changed from an aspirational distribution of as low as 5% in the bottom two "buckets" to a forced distribution of 12%.

53. Upon information and belief, a sub-section of approximately one-half to two-thirds of the aforementioned 12% mandated by CIO Alexander (or alternate percentage within sub-units of Technology) was required to be involuntarily terminated per Capital One's mandate to increase "involuntary attrition."

54. In other words, the "involuntary attrition" rate mandated by CIO Alexander for was between 6% to 8% the Technology department.

55. The Technology Development Program, or TDP, was part of Capital One's aforementioned Campus Recruiting Program (CRP) by which Capital One made an effort to hire recent college graduates in its Technology department.

56. CIO Alexander has stated that he expects all hires into the Tech department at Capital One to come in through TDP within the next few years.

57. During this time frame, CIO Alexander also stated in an email that "one-third of our organization has not been through a formal calibration." Many of those recent hires were younger employees, including recent college graduates hired through the TDP program. In a

2017 blog post, CIO Alexander stated that "70% of Tech associates joined the company within the past four years…many of these new hires being people leaders – and new to People & Performance Management (PPM) at Capital One."

58. Capital One managers intentionally, or at the instruction of Capital One, did not place younger employees or newer hires in the bottom two "buckets" during its "forced" or "stack" rankings, keeping such younger employees outside of mandatory 12% of employees which formed the pool from which Capital One selected its involuntary terminations within the Technology department.

### Termination of Lanius

59. Although Lanius was re-hired by Capital One in 2011 at age 53, that was before it implemented its policy to increase "involuntary attrition" beginning in 2017.

60. Capital One's termination of Lanius did not arise out of individual circumstances. It was a result of Capital One's mandate requiring managers to increase "involuntary attrition."

61. Performance evaluations were typically done once a year, with results coming out in late January for the prior calendar year's performance. There was also a mid-year performance status in June or July, but it was fairly informal.

62. However, in furtherance of Capital One's policy to use "performance management" to increase "involuntary attrition" rates, the mid-year performance process became as stringent as the year-end one, and managers were also required to meet "distribution" goals during this formerly informal "mid-year" process. So long as each department's "distribution" percentages met the goal established by Capital One executives, the front line managers were given unchecked discretion over their rating assignments and calibrations, even if such discretion went against stated policy.

63. From her re-hire in 2011 through 2017, Lanius consistently received strong performance evaluations.

64. In fact, Lanius received a bonus in 2017 for her "Strong" evaluation for Year End 2016. Less than five months after receiving her performance bonus, out of the blue, Lanius was placed on a "coaching plan" following this newly formal "mid-year" review process.

65. Lanius's boss, Ed Paraiso told her that he had been "directed" to apply forced distribution of 20% as not meeting expectations for the "mid-year" review. Paraiso had ten direct reports, so he was required to rate two employees in the inconsistent "bucket."

66. Paraiso told her that he would not have issues with her "mid-year" check-in except that he was being forced to do something by his managers.

67. Paraiso initially told her that he would place her on an informal "development plan" but not enter it into Capital One's HR system. Later he informed her that he was "required" to put Lanius on a coaching plan based on the mid-year forced distribution.

68. Lanius disputed this process and the conclusion that she was a poor performer.

69. Capital One's review process focuses on two overall areas: results (objective metrics) and competencies (subjective criteria).

70. Capital One requires its managers to try to identify both "strengths" and "opportunities" for improvement on every performance evaluation.

71. Paraiso confirmed that Lanius met all objective "results" criteria in the review.

72. Paraiso identified two subjective "competencies" for her so-called opportunity: "Builds Relationships and Communications." Lanius asked her boss directly: are you putting me on a coaching plan based on this "opportunity"? He appeared very uncomfortable to Lanius but confirmed this was so.

73. Lanius's mid-year evaluation did not contain any score or rating. The fact that Capital One required her boss to issue her a coaching plan without any poor performance rating demonstrates the bogus nature of Capital One's forced distribution policy.

74. During Lanius's coaching plan, she saw another position within Capital One for which she qualified. Lanius requested her boss to let her transfer, but he informed her that Capital One will not let this happen because of its newly implemented "No-Transfer" policy.

75. Lanius expressed her confusion since Capital One regularly allowed, and in fact encouraged transfers in the past, especially among employees with alleged difficulties in their current role in to allow the employee an opportunity to thrive somewhere else, e.g. a different boss, team, or a different department altogether.

76. Paraiso, Lanius's former boss, is a person of the highest integrity. He told her he was "sick" about these events and felt compelled to tell her "what's really happening." He stated:

    a. Lanius's coaching plan is a "sham;"

    b. Lanius would be placed on a PIP and will be terminated;

    c. That he was told CIO Rob Alexander wanted "8% out the door" by January 2018.

77. At the conclusion of Lanius's coaching plan, Paraiso confirmed that Lanius met all the requirements/expectations of the plan, and that he told his boss the same, but he was not allowed to mark her in the system as having successfully completed it. Officially, Lanius had failed her coaching plan because it was mandated by Capital One.

78. In late 2017, Capital One issued Lanius a PIP, and subsequently terminated her for alleged poor performance effective January 13, 2018.

79. Under Capital One's use of "Performance Management" to drive up "involuntary

attrition," the PIP was basically the last nail in the coffin for the targeted employee. A termination with a PIP on the record was treated by Capital One as a "performance" based termination, providing for the least amount of severance and rendering the employee ineligible for rehire.

80. Capital One listed Lanius as a "performance" termination, and provided her the "Performance Benefit Structure" severance package.

81. Lanius disputes that she was a poor performer. Years of Strong performance evaluations since 2011, and her boss's statements to her, contradict Capital One's documents that claim she was terminated for poor performance.

82. Capital One's justification for Lanius's coaching plan, PIP, and termination were false.

83. Lanius was the oldest employee in her group at age 59. The coaching plan completed by her supervisor claiming that Lanius was a poor performer was pretextual and false, and was issued in order to meet Capital One's "forced distribution" requirement in order to increase involuntary attrition.

84. Upon information and belief, other older employees, who were also objectively strong performers, were also targeted and terminated by Capital One around the same time as Plaintiff.

85. Capital One's process and policy of increasing involuntary attrition in the manner set forth herein (through "performance management" and job eliminations), is a facially neutral policy that has a disparate impact on employees over age 40 across all lines of business at Capital One.

86. Such policy is an employment termination program under the OWBPA that

affects two or more employees.

87. Upon termination of Lanius, Defendants provided, and Lanius signed, a Letter of Agreement ("Agreement") which provided her severance pay in exchange for waiving certain claims against Defendants. Capital One has a copy of this Agreement which is substantially similar to the Agreement in *Hutchens v. Capital One*, Case No. 3:19-cv-546 (ECF No. 1-1).

88. Upon termination of Plaintiff and other affected employees, Capital One failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided.

89. Capital One did not provide 45 days, nor the statistical data of ages and job titles of other employees as required by OWBPA.

### Count 1 – OWBPA

90. OWBPA claims may not be released.

91. ADEA claims may not be released unless they comply with the OWBPA.

92. Capital One's Letter of Agreement did not comply with OWBPA.

93. The policy alleged herein was an "employment termination program" affecting two or more employees.

94. The Agreement provided to Plaintiff and others did not provide 45 days to consider the waiver of any rights or claims under the ADEA.

95. The Agreement provided to Plaintiff and others did not provide the job titles and ages of all individuals selected or not selected for termination under such policy alleged herein.

96. The Agreement was not a "knowing and voluntary" waiver of Plaintiff's rights and claims under the ADEA.

97. Plaintiff is entitled to declaratory, equitable, and/or injunctive relief based on

Capital One's OWBPA violation including but not limited to: age and job title data across the applicable line(s) of business, data reflecting "involuntary attrition" rates, other statistical data relating to these claims; an order declaring Capital One in violation of OWBPA and permitting Plaintiff to proceed with her claim under the ADEA, without retaliation and without being in breach of the Letter of Agreement; an award of attorneys' fees and costs; and other equitable, injunctive, and/or declaratory relief requested below.

98. The party asserting the validity of an OWBPA waiver has burden of proof that it was "knowing and voluntary." 29 USC § 626(f)(3).

99. Capital One cannot prove that the Agreement was knowing and voluntary.

### Count 2 – ADEA

100. Capital One discriminated against Lanius because of her age, 59.

101. Capital One characterized Lanius's termination as an "involuntary" termination based on performance.

102. Capital One provided Lanius with a severance in an amount referred to as the "Performance Benefit Structure" which, according to its Associate Severance Plan, applies where "the associate is terminated due to poor performance."

103. The allegation of poor performance was pretextual and false. At the time Lanius was placed on a coaching plan her most recent performance evaluation was "Strong" and for which she was awarded a performance bonus.

104. Lanius was told that her coaching plan was a "sham," and that Capital One was requiring that she be issued a PIP which she would not successfully complete.

105. The reasons noted for Lanius's termination (i.e. poor performance) were pretextual and false.

106. Lanius was the oldest person in her group.

107. But for Lanius's age, she would not have been placed on a "coaching plan," nor selected for PIP or termination.

108. Capital One disparately treated Plaintiff and other older associates, and treated younger employees more favorably, in the forced ranking and termination of older employees.

109. Capital One's disparate treatment of Plaintiff and older employees was willful.

110. Capital One's policies also had a disparate impact on older employees. Specifically, Capital One's policy to increase the rate and percentage of "involuntary attrition," which was implemented through a "performance management" policy which required forced or "stack" rankings to create a pool from which "involuntary" terminations were implemented, was the standard operating procedure at Capital One. This policy had a disparate impact on Capital One employees over age 40. The average age of Capital One employees was reduced as older employees were replaced, in "headcount," by newer hires, many of whom were in their early to mid-20's including CRP hires.

111. Plaintiff was disparately impacted because of her age by Capital One's policies which resulted in her termination.

112. Capital One implemented such discriminatory policy willfully, or showed reckless disregard for the rights of Capital One's employees over 40.

113. Given Capital One's "best people philosophy," which involves hiring the "best talent in the industry," Capital One's policy of using "forced distributions" under the guise of "performance management" in order to increase "involuntary" terminations was implemented willfully with the intent to eliminate employees over 40 years of age while increasing hiring of younger employees. Alternatively, it was a neutral policy that disparately impacted employees

over 40.

### Relief Requested for OWBPA

Wherefore, Plaintiff requests the Court grant the following Relief:

    A.    Issuance of an Order finding that Capital One did not comply with the OWBPA;

    B.    Declaring that Capital One's policy, as alleged herein, was an "employment termination program" under OWBPA;

    C.    Declaring that the "Letter of Agreement" does not comply with the OWBPA, that the waiver contained therein was not "knowing and voluntary," and that Plaintiff may proceed with her ADEA claim;

    D.    An Order directing Capital One to comply with OWBPA, including producing the ages and job titles of employees who were selected and /or non-selected for termination under the policy alleged herein, which should have produced under OWBPA;

    E.    An Order directing that notice be delivered to all Capital One employees involuntarily terminated under the policy alleged herein, who received a Letter of Agreement, informing them that their waivers are invalid and that those employees may have ADEA claims;

    F.    attorneys' fees; and

    G.    any and all further relief permissible by law.

### ADEA Relief Requested

Wherefore, Plaintiff requests the following Relief against Defendants:

    A.    Court order requiring Capital One to provide statistical data relating to employees and ages, involuntary attrition rates, headcount, performance management

calibrations, forced rankings, involuntary terminations, new hires, and any other employment data relevant to Plaintiff's disparate impact claim;

  B. money damages suffered by Plaintiff as a result of Capital One's age discrimination of Plaintiff, including but not limited to lost pay, benefits, and the difference in severance benefits between Capital One's "Performance Benefit Structure" which Plaintiff received, and the greater sum of the "Restructuring Benefit Structure" which Plaintiff should have received as a result of the policy alleged herein;

  C. liquidated damages in an amount equal to all money damages suffered by Plaintiff as a result of Capital One's willful violations of the ADEA;

  D. pre-judgment and post-judgment interest;

  E. reasonable attorney's fees and costs expended in the prosecution of this case;

  F. any and all further relief permissible by law.

Plaintiff respectfully demands **TRIAL BY JURY** for all factual questions at issue in this case.

        Respectfully submitted,
        **Tammy Lanius**
        Plaintiff


        By:____/s/_____
        Craig Juraj Curwood (VSB No. 43975)
        Curwood Law Firm, PLC
        530 E. Main Street, Suite 710
        Richmond, VA 23219
        Telephone: (804) 788-0808
        Fax: (804) 767-6777
        ccurwood@curwoodlaw.com

and

Harris D. Butler, III (VSB No. 26483)
Paul M. Falabella (VSB No. 81199)
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Telephone: (804) 648-4848
Facsimile: (804) 237-0413
harris.butler@butlerroyals.com
paul.falabella@butlerroyals.com
*Attorneys for Plaintiff*